UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 3:19CR202(JAM) |
| | : | |
| v. | : | |
| | : | |
| MARIO ANTONIO HERRERA, | : | |
| a.k.a. ANTONIO MORALES | : | August 21, 2020 |

## GOVERNMENT'S SENTENCING MEMORANDUM

The Government respectfully submits this Memorandum in support of the August 31, 2020 sentencing of the defendant, Mario Antonio Herrera, for the offense of Reentry of a Removed Alien, in violation of 8 U.S.C. §§ 1326(a) and (b)(1).  In this case, the defendant's immigration and criminal history, to include seven prior convictions, one of which involved two counts of carrying a dangerous weapon and another involving a violent assault, supports imposition of a sentence at the high end of the agreed upon Sentencing Guideline range of 18 to 24 months' of incarceration, followed by a period of supervised release.  Such a sentence is a fair and reasonable sentence in light of the sentencing factors articulated in 18 U.S.C. § 3553(a) and in full recognition of the challenges faced by the current Covid-19 pandemic.

## I.    Introduction

On February 20, 2020, the defendant, Mario Antonio Herrera ("Herrera"), a native and citizen of El Salvador, entered a guilty plea to the felony offense of Reentry of a Removed Alien, in violation of 8 U.S.C. § 1326(a) and (b)(1).  PSR ¶ 1.  As the defendant's deportation was subsequent to his conviction for a felony, that being his conviction on July, 24, 2008, in the District of Connecticut, for the offense of assault in the second degree, in violation of Connecticut General Statutes, § 53a-60, the maximum statutory penalty faced by defendant

Herrera is increased from two (2) to ten (10) years.  18 U.S.C. § 1326(a) and (b)(1), PSR face

sheet, ¶ 76.  Defendant Herrera additionally faces a term of supervised release of up to three (3)

years, a maximum fine of $250,000, and a $100 mandatory special assessment.[1]  PSR face sheet,

¶¶ 79, 83-84.

The final Presentence Report ("PSR") and its Addendum, filed on August 11, 2020,

calculates the defendant's base offense level at level eight (8), pursuant to U.S.S.G. § 2L1.2(a).

PSR ¶ 20.  The offense level was increased by eight (8) levels pursuant to U.S.S.G.

§ 2L1.2(b)(2)(B), as defendant Herrera committed the instant offense subsequent to the

commission of a felony offense for which the sentence imposed was two years or more.  PSR

¶¶ 21, 39.

Following a three-level reduction for acceptance of responsibility, the adjusted offense

level for defendant Herrera is 13, and with a criminal history score of 10, resulting in a Criminal

History Category of V, the Guideline imprisonment range is 30 to 37 months.[2]  PSR ¶¶ 40-41,

77.  The Sentencing Guidelines additionally recommend that the sentence of incarceration be

---

[1] It is noted that as the date of this filing, the docket does not reflect that the defendant has
submitted the required financial affidavit.

[2] As outlined in its comments and objections to the PSR, the Government believes that the
defendant's Criminal History score may be more appropriately scored at III, which is consistent
with the parties' agreement in the plea agreement filed in this case. The difference is due to the
Probation Officer's determination that use of an earlier offense conduct date is appropriate.  This
belief is premised upon the fact that the defendant told an immigration deportation officer, in an
*unMirandized* processing interview, that he illegally reentered the United States in the summer of
2014.  This date is five years earlier than the date utilized by the Government in the indictment,
which charged him with being 'found' in the United States on July 1, 2019. PSR 31.  While the
Government appreciates that the concept of relevant conduct allows the Court to use this earlier
date pursuant to the preponderance of the evidence sentencing standard, it stands by the terms of
the plea agreement.

followed by a period of supervised release of one to three years, a fine range from $5,500 to $55,000, and a $100 mandatory special assessment [3]  PSR ¶¶ 80, 84-85.

## II.   Background

The defendant, Mario Antonio Herrera, a.k.a Antonio Morales, a native and citizen of El Salvador, was born on August 25, 1983, making him 37 years of age on the date of his scheduled sentencing.  PSR page 2, ¶ 46.   Defendant Herrera held legal status in the United States with Temporary Protected Status ("TPS")  for a one-year period beginning in October 2002, but he did not file a formal application with the Department of Homeland Security, Citizenship and Immigration Services ("CIS") for renewal of TPS, resulting in the expiration of his legal status.[4]  PSR ¶ 6.

Defendant Herrera did not, however, leave the United States and overstayed his welcome. Instead, he remained in Connecticut and engaged in serious criminal conduct to include seven convictions involving both violent and reckless crimes, in addition to failing to appear in Court and violation of the terms of probation.  PSR ¶¶ 33-39.  More specifically, on August 1, 2004, the defendant was arrested for and subsequently convicted in the Superior Court, Hartford Judicial District, of breach of peace in the 2nd degree, resulting in a 6 month suspended sentence with 2 years' conditional discharge.  PSR ¶ 33.  Just two weeks later, on August 15, 2004, defendant Herrera was charged with failure to respond, resulting in the forfeiting of his original

---

[3] U.S.S.G. § 5D1.1(c) advises that "the court should not impose a term of supervised release in a case in which supervised release is not required by statute and the defendant is a deportable alien who likely will be deported after imprisonment."  However, Application Note 5 of the same Guideline advises, "The court should, however, consider imposing a term of supervised release on such a defendant if the court determines it would provide an added measure of deterrence and protection based on the facts and circumstance of a particular case."  U.S.S.G. § 5D1.1 n.5.

[4] TPS status was authorized for El Salvadorians on the basis of devastating earthquakes occurring in that country in 2001.

3

bond.  PSR ¶ 34.  Then on March 9, 2005, some seven months later, he was charged and subsequently convicted of criminal mischief in the 3rd degree in the Superior Court in East Hartford, Connecticut, resulting in an unconditional discharge and then he was convicted of failure to appear in the 2d degree related to the same underlying offense, resulting in his incarceration for 4 months.  PSR ¶¶ 34-35.   Significantly, on August 21, 2005, while he was in failure to appear status on the criminal mischief case, defendant Herrera's level of violence escalated and he was charged in the State of Connecticut, Superior Court in East Hartford, with two counts of carrying a dangerous weapon.  PSR ¶ 37.  This case resulted in a sentence of 2 years' incarceration, with 120 days to serve followed by 2 years of probation.  *Id.*

Defendant Herrera was next convicted on July 24, 2008 of reckless endangerment.  PSR ¶ 38.  This offense involved the defendant holding a folding knife up to a victim, arguing with him and then violently forcing the victim to the ground, causing facial injuries.  *Id.*  For this offense he was sentenced to 12 months concurrent to a 20 month sentence for violation of the still pending two years of probation associated with the carrying a dangerous weapon conviction.  PSR ¶ 37.

None of these criminal encounters resulted, however, in immigration action being taken against defendant Herrera.  PSR ¶ 7. That is, until the reckless endangerment conviction and violation of probation convictions imposed on July 24, 2008,  PSR ¶ 27.  On July 29, 2009, while serving his State sentence, the Department of Homeland Security, Immigration and Customs Enforcement ("ICE") issued defendant Herrera a Notice to Appear before an immigration judge based on his illegal entry into this country, a lack of documentation and his conviction for a crime involving moral turpitude.  PSR ¶ 9.  Following a hearing in Boston, MA, defendant Herrera was ordered removed from this United States to El Salvador.  *Id.*  He waived appeal and

a warrant of removal was executed on March 26, 2010.  *Id.*  During his hearing, the defendant was advised, in writing, that he was permanently barred from seeking permission to reenter the United States.  *Id.*

However, despite the permanent bar, Herrera illegally returned to the United States, by his own admission, only four years later.  PSR ¶ 12.  ICE realized that the defendant was, again, back in the United States on July 1, 2019, when he was arrested in East Hartford, Connecticut, for disorderly conduct and interfering/resisting arrest using the alias of Antonio Morales. PSR ¶ 43.  The ICE processing report, provided in discovery in this case, states that the incident involved domestic violence in that defendant struck his girlfriend, resulting in swelling on her left eye.  Defendant Herrera was taken into ICE custody following his release on a bond from the State.  As is often the case, the pending charges were thereafter nolled by the State.

Of additional note with regard to his processing with ICE is that statement defendant Herrera also told the ICE officer that he walked across the border in an "effort to get away from possible trouble with a neighbor."  *Id.*  He later stated something entirely different; that "a gang wanted him to pay a monthly fee however, he was unable to afford it."  PSR ¶ 69.

An expert fingerprint examiner from the Connecticut State Police confirmed that defendant Herrera's arrest fingerprints were a match to the fingerprints of the individual removed from the United States to El Salvador on March 26, 2010.  PSR ¶ 14.  On July 25, 2019, CIS issued a certification attesting that defendant Herrera had not sought or obtained permission to reapply for admission into the United States. PSR ¶ 13.

The defendant's claim for asylum in this country was denied on July 18, 2019, by the asylum branch of CIS in Boston, Massachusetts, and he is awaiting review of that decision by an immigration judge.   The defendant's prior Order of Removal has been reinstated, but he will not

be removed to El Salvador upon completion of service of this sentence pending the required

review.  If defendant Herrera completes this federal sentence prior to the rendering of a decision,

ICE will have to determine whether  he should remain in custody pursuant to mandatory

detention as he is an aggravated felon, or whether given the climate of the pending pandemic, the

defendant will be released from custody, most likely on electronic monitoring.  In summary, it

cannot be unequivocally stated that the defendant will be deported to El Salvador or how long it

will take to initiate the removal proceeding if the asylum decision is affirmed.  All that can be

stated is that it is typically the case, at present, that removal to El Salvador from the northeast

region has been taking 4 to 6 weeks' time.

## III.    Discussion

The Government respectfully requests that the Court sentence defendant Herrera to a

sentence of 24 months in custody, that being at the high end of the Guideline range that the

parties' believed to be accurate, followed by a three year term of supervised release.[5]  This

sentence is warranted because the defendant illegally entered, was convicted of seven criminal

offenses to include violent crimes, failure to appear and two probation violations within a span of

a little over three years, was deported as an aggravated felon and advised that he was

permanently barred from reentering this country, and then, nonetheless, illegally reentered this

country.  His criminal conduct suggests, and he even admits, that he has and continues to abuse

alcohol, despite the fact that he has engaged in and successfully completed treatment while

servicing a prior state sentence.   In short, he is exactly the type of person who is appropriate to

---

[5] If the Court determines that the correctly calculated Sentencing Guideline range is the 30 to 37 month range calculated in the PSR, then the Government does not object to the Court departing to a range of 18 to 24 months, pursuant to *United States v. Fernandez*, 877 F.2d 1138 (2d. Cir. 1989), to give effect to the plea agreement.

prosecute federally for the offense of illegal reentry. His claim that his prior convictions occurred some time ago fail to recognize that the passage of time was the result of his service of a significant state sentence followed by his removal to El Salvador.

The defendant, nonetheless, seeks a significantly below-Guidelines sentence of time served, reducing his sentence from the PreSentence Report's calculated range of 30 to 37 months and the plea agreement's range of 18 to 24 months, to a term that is only 2/3 of the low end of the plea agreement's range and only 1/3 of the high end of the plea agreement's range, that being a period of approximately one year of incarceration.  He seeks to convince this Court to impose a time-served, well below-Guidelines sentence because of the fact that we are in the middle of a health crisis in this country, because he will be not be able to obtain benefits available to other federal inmates, because he will serve approximately two months in immigration custody prior to his removal, because our country's current immigration climate will make it more difficult for him to illegally reenter, and because he claims that he has been sufficiently deterred.  He supports his position with political rhetoric regarding immigration policy, the poverty in El Salvador and general information regarding health risks faced by incarcerated defendants during the pandemic.

Defendant Herrera's request for a significantly below-Guidelines sentence is not only unwarranted in this case, but is based on inaccurate assumptions with regard to the time it will take to remove him to him to El Salvador, as well as the representation that he has been sufficiently deterred by the time he has served in pretrial detention.  It is reiterated that he will not be removed until an immigration judge affirms CIS' denial of his asylum claim.  And with regard to his claim that the year he has served in federal custody has provided sufficient deterrence, it is noted that the defendant was clearly not deterred from engaging in additional

immigration or criminal conduct by virtue of the 28 months he spent incarcerated in the State for his July 2008 assault 2d conviction or the 20 months he spent incarcerated in the state for a violation of the probation associated with his two 2005 carrying a dangerous weapon convictions.

Additionally, with no documented health issues other than occasional headaches, and the Coronavirus outbreak contained at Wyatt, the institution where he is being held, there is no reason that COVID-19 health crisis should serve as a windfall to secure his release.[6] [7]  A downward variance granted upon the backdrop of defendant Herrera's flagrant and repeated disregard for this country's immigration laws and his criminal history is unwarranted and must be addressed through this Court's imposition of a recommended 24 months, the high end of a Guideline range sentence that is far lower than the 30-37 month sentence calculated in the PreSentence Report.

    A.    <u>The Sentencing Guidelines are Correctly Calculated and Properly Utilized</u>

        i.    History and Characteristics of the Defendant

The defendant has painted a picture of an upbringing that was impoverished, but appears to have been filled with love and support, along with efforts for his entire family to obtain a better life in the United States.  PSR ¶¶ 46-51.  Defendant Herrera has stated that he has 12 siblings, ranging in age from 18 to 47, placing him somewhere in the middle of the biological offspring of his both of parents.  PSR ¶¶ 47-48.  At least eight of his siblings live in the United

---

[6] Defendant Herrera states that due to an injury, he finds it difficult to see out of one eye and it often hurts him but there is no indication that he is being treated for this medical issue.

[7] The report issued by the Warden at Wyatt on August 11, 2020, advises that there are no active infections among the staff and a single inmate remains positive, but is asymptomatic and sequestered in a negative pressure cell in the Health Services Unit.

State, and all but one are stated to live in Connecticut.  *Id.*  Defendant Herrera advises that he initially came to this country when he was only 14 years of age and despite their lack of funds, his family was able to pay $7,000 for him to be smuggled here.  PSR ¶ 51.  After traveling through Guatemala and Mexico, the defendant stated that he walked across the border into Houston, Texas where he remained for three days before joining his siblings in Connecticut.  *Id.* It is unclear how he travelled to Connecticut, how his siblings had the monies to travel to this State, or how they made their way to this State.  But, it is also noted that he told ICE during a processing interview on March 20, 2009, that he walked across the Mexican border to Arizona around March of 1998.  PSR ¶ 8.  It is thus unclear as to which version of his illegal entry is accurate.

Defendant Herrera also told an ICE deportation officer when he was being processed for removal in July of 2019, that he returned to this country because he wanted to "get away from possible trouble with a neighbor" and wanted him family to provide financial support.  PSR ¶¶ 12, 98.   He states that he lived with his mother and sister in East Hartford, Connecticut, but, curiously, is "unsure of the address."  PSR ¶54.  He is now, however, seeking review by an Immigration Judge of the denial of his asylum claim because he fears gang violence due to extortion.  PSR ¶ 53.  These inconsistent statements raise questions regarding the defendant's veracity given that, as previously noted, he also provided two versions of his reason for leaving El Salvador.

Defendant Herrera also claims that he appreciates that he cannot return to the United States and that he will not return this country.  PSR ¶ 17.  Yet, at the same time, he has illegally entered and illegally returned to this country and has a large family and a daughter in Connecticut.  He has also stated that he is fearful of his return to El Salvador and will likely go to

9

Mexico.   Thus, while he may have the intent to remain in outside of this country at present, it is

uncertain whether his present intent, if it is accurate, will continue to remain his intent over time.

> ii.   The Nature and Circumstances of the Offense

In this case, the defendant's disregard for the finality of an order of removal coupled with

an extensive criminal history has generated an offense level of 13 and the attribution of a

criminal history category of V.  He illegally entered this country, sustained seven significant

state convictions resulting in imposed sentences of up to 28 months to serve, and thereafter

illegally reentered the United States.   Despite defendant Herrera's claims to the contrary, his

encounters with immigration and criminal law enforcement authorities have not been sufficient

to deter the defendant from his illegal conduct.  He claims to have returned to this country as he

wanted to escape either a dispute with a neighbor or extortion from a gang in El Salvador, as

well as to obtain the financial support of his family.   However, the Second Circuit has stated that

"8 U.S.C. § 1326 is 'designed to deter deported aliens from illegally reentering for *any* reason,'

and that, as a result, the motive of a defendant convicted under that statute perhaps may not be a

relevant sentencing factor."  *United States v. Leiva-Deras*, 359 F.3d 183, 191 (2d Cir. 2004)

(quoting *Carrasco*, 313 F.3d at 755).

> iii.   The Sentence Should Emphasize Respect for the Law

One of the factors the Court must consider in imposing a sentence is the need for the

sentence to reflect the seriousness of the offense and to promote respect for the law.  18 U.S.C. §

3553(a)(2)(A).  The defendant has a long history of disregarding the gravity of his actions and

the requirements of the law.  He appears to have no appreciation for the seriousness of his

actions, as evinced by his illegal entries into the United States as well charges relating to serious

criminal activity while in this country.  Moreover, defendant Herrera blatantly disregarded the requirement of a permanent bar from seeking application for reentry to the United States.

In *United States v. Figueroa-Taveras*, the Court of Appeals affirmed the District Court's decision not to grant a downward departure from the Guidelines range.  287 Fed. Appx. 947, 948 (2d Cir. 2008).  The Court declined to grant a downward departure despite the fact that the defendant had spent thirteen months in prison on a separate illegal entry charge.  *Id.*  The Court found that the defendant's prison time "did not seem to have deterred the defendant from reentry, in other words, from committing the crime."  *Id.*  Likewise, in the present case, the defendant's actions have shown a continuous disrespect for the law, and his sentence should reflect this contempt of this country's immigration and criminal laws.  In addition, he illegally reentered this country, despite the fact that he was warned that he could be prosecuted for his illegal reentry.

> iv.   A Guideline Range Would Meet the Goals of Just Punishment, Specific, and General Deterrence

A Guidelines sentence is appropriate in the present case "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the law."  18 U.S.C. § 3553(a)(2)(A).  If the Court were to grant the defendant's request for a significantly below-Guidelines sentence, it will clearly send the wrong message to defendant who needs to heed the correct message.   A downward departure is not a just punishment for the defendant and he would likely not be deterred from further illegal reentry into this country.  While he claims he understands that he cannot return, the fact remains that he made a good living here was surrounded by family, and was always able to obtain employment.  The same may not be true for him in El Salvador or even in Mexico, if he relocated in that country.

Likewise, other illegal aliens will not be deterred from entering the United States if they see there are no serious consequences to those actions.  The defendant has illegally entered the

United States despite a permanent bar from seeking permission to reentry.  As the Sentencing Commission has said, "General deterrence of criminal conduct dictates that a clear message be sent to society that repeated criminal behavior will aggravate the need for punishment with each reoccurrence."  U.S.S.G. Ch. 4, Part A (introductory cmt.).  The defendant should be sentenced to a term of imprisonment of 24 months, the high end of the agreed-upon Guidelines range and far less than even the low end of the range calculated in the PSR, to make the statement that there are consequences for repeated criminal behavior.  To impose a significantly below Guidelines sentence of time served at the time of sentencing, would be as if no sentence was imposed at all.

The defendant argues that "additional prison is not necessary and does not make sense." Defendant's Memorandum in Aid of Sentencing at 3.  He additionally argues that he has been deterred and that there is general deterrence in what will happen to him.  *Id.*  However, the defendant's illegal reentry and serious criminal convictions in the United States are exactly the type of conduct a Guidelines sentence was designed to address. The message needs to be sent that flagrant violations of United States laws will not be tolerated, especially not from an individual who was no lawful status here and is keenly aware of that fact. Granting a downward variance to this defendant beyond the reduction either from a CHC V to a CHC III or through a *Fernandez* departure, would send the absolute wrong message.

B. <u>There is no factual or legal basis for a  downward departure or variance based on the Current Pandemic</u>

The defendant focuses his argument, in significant portion, on the current health crisis we are facing in this country.  Defendant's Memorandum at 12-16.  Citing statistics, news articles and some case law, he asserts that the defendant should be sentenced to time-served because of the health risk he faces due the Covid 19 pandemic.  This argument suggests that the current

12

health crisis should serve as a windfall to the defendant, who is able bodied, possesses no

identified health issues, but for occasional headaches for which he takes an over the counter pain

reliever and an old eye injury for which he takes no medication, and is in an institution where, as

of this date, only one cases of Covid 19 have been identified and that inmate, who is

asymptomatic, is segregated in the health services unit, far away from defendant Herrera.   As he

is no different than any of the other able-bodied defendants in pre-sentence custody, he appears

to be suggesting that the pandemic should serve as a basis for every inmate's release, perhaps

with the exception of those who present a significant risk of violence (which may include him).

The Government is not suggesting that inmates should be put in harm's way in that everyone

should be treated fairly and remain as safe as possible.  However, just as the public should not

profit from a crisis by selling hand sanitizer at excessive rates simply because it is in short

supply, nor should defendant Herrera profit from this current health crisis through his

unwarranted early release. We still live in a society that is based on compliance with the law and

we cannot open prison doors, setting aside recommended Sentencing Guideline ranges, for

heathy defendants who have committed repeated criminal offenses, even in the midst of a

pandemic. His argument for a downward departure to a sentence of time-served in this case

based on Covid 19 is simply unwarranted and should be denied.

      C.  <u>Claimed Additional Consequences Faced Do Not Support a Downward Variance or
Departure in this Case</u>

      The defendant argues that when considering the parsimony clause of 18 U.S.C.

§ 3553(a), a sentence of time served is appropriate in this case because it is "sufficient, but not

greater than necessary" to comply with the purposes of sentencing.  Defendant's Memorandum

at 7.  In following, he argues that his status as a deportable alien will place him in a position

where he will be ineligible for a minimum-security prison placement and/or a camp or halfway

house placement if sentenced to a custodial sentence and he will not be credited for the time he spends in administrative immigration custody, which will be as long as two months.  Def. Memo. at 8-11.  However, these claims do not support a significantly below Guidelines sentence of time served.  Defendant Herrera's ineligibility for a camp or halfway house at the conclusion of his sentence is a logical consequence of a reentry conviction, as neither placement is appropriate for someone who is to be removed from the country.  Moreover, to serve one's entire sentence is not to say that the sentence is unfairly severe.  Instead, he will serve the imposed sentence and nothing more.

In *United States v. Restrepo*, the court found that a downward departure based on a defendant's status as an alien resulting in ineligibility for certain "preferred" conditions of confinement, such as a minimum security facility and a halfway house, as well as the fact of possible post-incarceration detention prior to deportation, were not individually or in combination, a valid basis for a departure.  999 F.2d 640, 644−645 (2d Cir. 1993).  *See also United States v. Wills*, 476 F.3d 103 (2d Cir. 2007) (reaffirming *Restrepo's* holding that a defendant's likely deportation after incarceration should not be considered in sentencing).  If an Immigration Judge affirms CIS's denial of the defendant's application for asylum, it is anticipated that the defendant will be in ICE custody for four to six weeks' time prior to his removal to El Salvador, and shorter if he is able to produce the El Salvadorian passport that he told ICE officers he possessed, not the two months that he references.  The defendant should be familiar with the timing as he has been previously removed.  Moreover, as of the date of the filing of this Memorandum, there are no anticipated delays due to the Covid 19 pandemic.

D.   A Period of Supervision is Appropriate In This Case

The dual purposes of deterrence and punishment of recidivists are particularly relevant in cases such as this where the defendant has returned to the United States during the period where, if not for his deportation, he may have been under the supervision of probation on supervised release.  In a typical case, probation and supervised release serves the purposes of reform of the offender and mitigation of the risk of recidivism because the Government monitors the offender on an ongoing basis.  In the case of an alien convicted of a serious offense, instead of being subjected to the supervision of probation for the term set by the court, they are typically deported prior to the start of probation or, more typically, supervised release is not imposed at all.  This is appropriate because their deportation essentially eliminates the need for the Government to monitor them for signs of recidivism.  Once outside the country, they cannot harm others in the United States.

When a deported alien illegally reenters the country, the governmental interest in reducing recidivism returns because the offender, if he re-offends, now may harm others in the United States.  However, as the offender reentered illegally he is not monitored by federal probation.  Therefore, the Government cannot reduce the risk of recidivism through careful supervision.  Illegal reentry is the rare case where a prior act increases the severity of the current offense since the Government has a strong interest in keeping certain types of offenders from reentering the United States.  "[F]louting of American immigration laws is a far graver matter where the defendant's prior deportation was for committing a serious crime than where the prior deportation was for a technical violation of the immigration laws." United States v. Campbell, 967 F.2d 20, 24 (2d. Cir. 1992).   It is important for the Court to consider imposition of a period of supervision following any sentence of incarceration imposed in this case, so that the defendant

15

can be monitored should he illegally return and his presence be discovered prior to his arrest on a new immigration charge.

**IV.     Conclusion**

      For the reasons outlined above, the Government respectfully requests that the Court impose a sentence at the high end of the 18 to 24 month agreed upon range of  imprisonment. The Government also respectfully requests that the sentence of incarceration be followed by a three year term of supervised release.  As the defendant has reentered the United States illegally and committed serious and violent criminal offenses evincing a complete disrespect for the laws of this country while illegally in this country, this sentence is warranted.

                        Respectfully submitted,

                        JOHN H. DURHAM
                        UNITED STATES ATTORNEY

                        /s/ *Deborah R. Slater*

                        DEBORAH R. SLATER
                        ASSISTANT UNITED STATES ATTORNEY
                        Federal Bar No. Ct04786
                        450 Main Street, Room 328
                        Hartford, CT 06103
                        (860) 947-1101

<u>CERTIFICATION OF SERVICE</u>

Pursuant to the Court's designation of this matter as an electronically-filed case, and in accordance with the requirements for certification of service in such cases, the undersigned certified that the foregoing document was filed electronically on this 18th day of August, 2020. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Deborah R. Slater*
DEBORAH R. SLATER
ASSISTANT UNITED STATES ATTORNEY